UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

SHELDON LEE HUTCHINS,
     Plaintiff,

v.                              Case No.: 3:20cv5952/MCR/ZCB

DAVID MICHAEL ROWELL, et al.,
     Defendants.
_____/

## REPORT AND RECOMMENDATION

This is a *pro se* civil rights action filed under 42 U.S.C. § 1983. The case is before the Court on the parties' cross motions for summary judgment. (Docs. 164, 165, 166, 170). For the reasons below, the motions should be denied.

### I.    Procedural Background

Plaintiff has named as Defendants in this action six deputies with the Santa Rosa County Sheriff's Office: Lt. Hays, Sgt. Campbell, Deputy Pendleton, Deputy Nowlin, Deputy Schultz, and Deputy Rowell. (Doc. 30). Defendants filed a motion to dismiss, which the Court granted in part and denied in part. (Docs. 124, 144). Following that ruling, the claims that remain are Fourth Amendment excessive force and failure to

1

intervene claims against Defendants Hays, Campbell, Pendleton, and Nowlin, as well as failure to intervene claims against Defendants Schultz and Rowell. All Defendants have now moved for summary judgment, and Plaintiff has responded in opposition. (Docs. 164, 165, 166, 182). Plaintiff has also moved for summary judgment, and Defendants have responded in opposition. (Docs. 170, 173, 174). The motions are ripe for resolution.

## II.    Factual Background[1]

This case began when Defendant Rowell, a patrol deputy with the Santa Rosa County Sheriff's Office, encountered Plaintiff on April 17, 2019. (Doc. 163-1 at 1-2). Rowell arrested Plaintiff for driving without a valid license. (*Id.* at 2). Rowell then transported Plaintiff to the Santa Rosa County Jail. (*Id.*).

Once at the jail, Rowell and Plaintiff entered the intake area. (*Id.*). At that point, Plaintiff's custody was turned over to detention deputies. (*Id.*). The events that occurred in the intake area are depicted in a video

---

[1] There are no genuine disputes about the facts summarized in this section.

(with audio) that Defendants have submitted to the Court. (Doc. 157-1). The Court has reviewed the video and will summarize what it shows.

The video begins with Plaintiff walking into the intake area and then standing with his hands cuffed behind his back. (Doc. 157-1, 03:20:16–03:20:26). Rowell then moves behind the intake desk. (*Id.*, 3:20:24–3:20:30). Defendant Nowlin, a detention deputy, enters the intake area. (Doc. 163-5 at 1-2; Doc. 157-1, 3:20:33). Rowell points to his mouth, alerting Nowlin that Plaintiff had something concealed in his mouth. (Doc. 157-1, 03:20:33–03:20:34). Nowlin then asks Plaintiff standard intake questions. (Doc. 163-5 at 2; Doc. 157-1, 03:20:58–03:21:52). Plaintiff provides mumbled responses. (Doc. 157-1, 03:20:58–03:21:52). Nowlin searches Plaintiff's clothing, while Rowell obtains Plaintiff's identifying information. (Doc. 157-1, 03:22:02–03:22:52).

Nowlin then turns Plaintiff around, and Plaintiff leans against the wall. (*Id.*, 03:22:52–03:22:59). Nowlin orders Plaintiff to open his mouth, and Plaintiff fails to respond. (*Id.*, 3:23:00). Next, Nowlin offers his hand to Plaintiff so that he can spit out the item. (Doc. 163-5 at 2; Doc. 157-1, 03:23:03–03:23:05). Plaintiff refuses. Rowell informs Plaintiff that if he

gets rid of what is in his mouth, then Plaintiff will not be charged with introducing contraband into the jail. (Doc. 163-1 at 3; Doc. 157-1, 03:23:05-09–03:24:35). Plaintiff still does not spit out the item.

Defendant Hays, a detention lieutenant, then enters the intake area. (Doc. 163-4 at 1-2; Doc. 157-1, 03:23:09). Nowlin again tells Plaintiff to spit out what is in his mouth. (Doc. 163-5 at 2-3; Doc. 157-1, 03:23:09–03:23:32). Nowlin and Rowell repeatedly order Plaintiff to spit out the item. (Doc. 163-1 at 3; Doc. 163-5 at 2-3; Doc. 157-1, 03:23:44–03:24:03). Then Hays places a garbage can near Plaintiff, encouraging him to spit the item into the can. (Doc. 163-4 at 2; Doc. 157-1, 03:24:03–03:24:09). Plaintiff does not spit anything out. (Doc. 157-1, 03:24:09–03:27:05; Doc. 159-1, 131:18–132:7).

Another detention deputy wearing a tan t-shirt (presumably Defendant Pendleton) enters the intake area. (Doc. 157-1, 03:24:32). Defendant Campbell, a detention sergeant, also enters the intake area. (Doc. 163-2 at 1-2; Doc. 157-1, 03:25:36). At one point, Plaintiff says he has gum in his mouth but still refuses to spit it out. (*Id.*, 03:25:44–03:25:45). Hays asks Plaintiff why he is sweating profusely. (Doc. 163-4

4

at 2; Doc. 157, 03:26:18–03:26:50).    Plaintiff responds that he was worried.  (Doc. 157-1, 03:26:27).

Hays then decides to move Plaintiff to the "Change Out Room" to be strip-searched and given additional opportunities to spit out the item. (Doc. 163-4 at 3; Doc. 157-1, 03:27:05).  Hays instructs Nowlin and Campbell to take Plaintiff to the Change Out Room.  (Doc. 163-1 at 4; Doc. 163-2 at 2; 157-1, 03:27:05).  Plaintiff walks out of the intake area with officers maintaining a custodial hold on each arm.  (Doc. 163-4 at 3; Doc. 157-1, 03:27:07–03:27:09).

The parties do not now dispute,[2] and the video clearly demonstrates, that none of the Defendants used force on Plaintiff in the intake area.  (Doc. 157-1 at 3:20:17–3:27:09; Doc. 159-1, 132:8–133:18).

_____

[2] Plaintiff initially stated that he believed some of the force had been used against him in the intake area.  Information obtained in discovery has revealed that all of the force was used in the Change Out Room as opposed to some of the force being used in the intake area and some in the Change Out Room.  That change in location is insignificant to the resolution of this litigation.    Plaintiff was experiencing a medical emergency and also being allegedly subjected to multiple uses of force by many different officers.  Thus, it is not fatal to his claims that Plaintiff did not accurately recall the precise room he was in when certain things occurred.  *See Wimbush v. Family Dollar Stores, LLC*, No. 1:21-CV-4078, 2022 WL 1592448, at *1-2 (N.D. Ga. May 19, 2022) (finding that the

Now let's move to the events in the Change Out Room.  Defendants submitted video (without audio) depicting the exterior doorway areas of the Change Out Room and holding cells #1 and #2. (Doc. 157-2, 03:26:38–04:22:25; Doc. 163-1 at 4-5).  The video shows Pendleton, Hays, Nowlin, and Campbell escort Plaintiff into the Change Out Room.  (Doc. 157-2 03:26:33–03:26:48).  Defendant Schultz enters the Change Out Room approximately ten seconds later.  (Doc. 157-2, 03:26:57; Doc. 163-3 at 2).

Plaintiff is in the Change Out Room with Hays, Campbell, Nowlin, Pendleton, and Schultz for around thirteen minutes.  (Doc. 157-2, 03:26:48–03:39:58).  Schultz leaves the room for a few seconds during that time to place a taser on a desk outside the room and to retrieve a restraint chair.  (*Id.*, 03:33:42–03:33:58).

Unfortunately, the video does not show what happened in the Change Out Room.  And the parties have divergent accounts of what occurred therein. The parties do agree, however, that Plaintiff was

───────────────

plaintiff's failure to identify in the complaint the correct location where an incident occurred did not warrant summary judgment because the change in location did not alter the duty owed by the defendant to the plaintiff).

sprayed with chemical spray, physically taken to the floor, physically restrained, struck, and tasered while in the Change Out Room. But they do not agree on the circumstances surrounding those uses of force nor do they agree on how many times force was used.

It is undisputed that Rowell did not use force inside the Change Out Room. But the doorway video shows that Rowell was in and out of the Change Out Room while other Defendants were using force. (Doc. 163-1 at 5-8). Rowell was in the Change Out Room for a total of approximately four minutes. (*Id.*). He stood near the open door of the Change Out Room and looked in for approximately seven minutes. (*Id.*). He was standing away from the door for approximately two minutes. (*Id.*). Rowell admits seeing others using chemical spray and a taser on Plaintiff inside the Change Out Room. (*Id.* at 9). But Rowell does not recall who administered those uses of force. (*Id.*). Rowell also admits to seeing Pendleton strike Plaintiff twice. (*Id.* at 7).

After approximately thirteen minutes in the Change Out Room, Plaintiff was wheeled out in a restraint chair and taken to a holding cell. (Doc. 163-4 at 8; Doc. 157-2, 03:39:50–03:40:12). Plaintiff was ultimately

moved from the holding cell and taken back into the Change Out Room to be decontaminated from the chemical spray. (Doc. 163-4 at 8-9; Doc No. 157-2, 04:02:25–04:02:41). Paramedics were summoned to the jail. When they arrived, Plaintiff entered an ambulance to be taken to the hospital. (Doc. 163-4 at 9; Doc. 157-2, 04:20:00–04:20:10). Once in the ambulance, Plaintiff spit a plastic baggie out of his mouth.[3] (Doc. 159-1, 100:22–101:21).

Upon arrival at the hospital, Plaintiff was shaking and appeared uncomfortable. (Doc. 163-7 at 2). He complained of abdominal pain, nausea, and vomiting. (*Id.* at 4). His mental status was "altered," but he was cooperative and there were "no barriers to communication." (*Id.* at 2). Plaintiff's respirations and heart rate were elevated. (*Id.*). Not long after arriving at the hospital, Plaintiff went into respiratory failure and was placed on a ventilator. (Doc. 170-1 at 36, 38). Plaintiff was diagnosed with metabolic encephalopathy secondary to drug overdose, aspiration pneumonia, and hypertension. (Doc. 159-3 at 4-5; Doc. 163-7 at 3; Doc. 170-1 at 35).

---

[3] It is undisputed that the plastic baggie contained methamphetamine.

Plaintiff posted a cash bond while in the hospital. (Doc. 163-6 at 19-21; Doc. 182, at 5). He remained out of jail until May 1, 2019 at 11:37 p.m., when he was booked back into the jail. (Doc. 163-6 at 16; Doc. 182 at 5).

### III.   Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A fact is "material" if it could affect the outcome of the case. *Anderson*, 477 U.S. at 248.

The central summary judgment question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. When answering that question, courts

must view the evidence in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The nonmoving party bears the burden of coming forward with sufficient evidence on each element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A mere "scintilla" of evidence is insufficient to meet that burden. *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004).

At the summary judgment stage, the judge is "not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. While *pro se* pleadings are liberally construed, "a *pro se* litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment." *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990) (cleaned up).

## IV.    Discussion

### A.    Defendants are not entitled to summary judgment on the issue of exhaustion.

#### 1.    The exhaustion requirement

Under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner must exhaust all administrative remedies before bringing an action for relief under any federal law. *Porter v. Nussle*, 534 U.S. 516, 520 (2002). The exhaustion requirement is intended to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Woodford v. Ngo*, 548 U.S. 82, 93 (2006). "The exhaustion requirement applies to all inmate suits about prison life." *Tilus v. Kelly*, 510 F. App'x 864, 866 (11th Cir. 2013). A court cannot waive the exhaustion requirement. *Alexander v. Hawk*, 159 F.3d 1321, 1326 (11th Cir. 1998).

To properly exhaust, an inmate must complete the administrative process in accordance with the prison's grievance procedures. *Jones v. Bock*, 549 U.S. 199, 218 (2007). Although an inmate must "exhaust available remedies," he "need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 636 (2016). In the Eleventh Circuit, courts apply a

11

two-step framework when deciding exhaustion issues. *Turner v. Burnside*, 541 F.3d 1077, 1082-83 (2008). Under the first step, the Court must "look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true." *Whatley v. Warden, Ware State Prison*, 802 F.3d 1205, 1209 (11th Cir. 2015). If the facts as stated by the prisoner show a failure to exhaust, then the case should be dismissed at step one. *Id.* Where dismissal is not warranted on the prisoner's view of the facts, it is necessary to proceed to step two. *Id.* There, "the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust." *Id.*

Because it is an affirmative defense, the defendant bears the burden of proving that the plaintiff failed to exhaust. *Turner*, 541 F.3d at 1082. If the defendant satisfies this burden, then the burden shifts to the plaintiff to show that the generally available procedure was unavailable to him. *Geter v. Baldwin State Prison*, 974 F.3d 1348, 1356 (11th Cir. 2020).

12

## 2.    Santa Rosa County Jail's grievance policy

At all relevant times, the Santa Rosa County Jail had an inmate grievance policy, as well an Inmate Handbook that set forth the procedure and requirements for an inmate to follow when submitting a grievance. (Doc. 163-6 at 1-4, 39-67). The Inmate Handbook states that a "kiosk" or touchpad device is located in each housing unit for inmates to communicate requests to various divisions of the jail. (*Id.* at 1). The Inmate Handbook defines "inmate" as "any person held" in the jail. (*Id.* at 2-3). It informs inmates that if they have complaints about the conditions of their confinement, then they may submit a grievance. (*Id.*). An inmate may submit a grievance by using the jail kiosk or by using a "hard copy" grievance form that can be obtained from the pod deputy. (*Id.*).

The Inmate Handbook states that there are "three stages" in the grievance process. (*Id.*). At stage one, an inmate must submit an initial grievance within either seven days after the incident occurs or from the date that the inmate becomes aware of facts giving him the right to file a grievance. (*Id.*). If extenuating circumstances arise, then the inmate has

an additional seven days, for a total of fourteen days from the date of the incident, to file a grievance. (*Id.*).

At stage two, an inmate may appeal to the Operations Administrative Supervisor or Support Supervisor within five days from the date of the formal response. (*Id.* at 2-4). At stage three, an inmate may appeal to the Jail Director or the Director's designee. (*Id.*).

### 3.    Analysis of Defendants' exhaustion argument

Defendants assert that Plaintiff failed to exhaust because he did not file any administrative grievances regarding Defendants' alleged excessive force on April 17, 2019. (Doc. 164 at 28-33; Doc. 165 at 3 n.1; Doc. 166 at 14). In support of this argument, Defendants have submitted the declaration of Maj. Brian Lewis, Plaintiff's booking records, the Inmate Handbook, and the grievance policy. (Doc. 163-6).

According to Maj. Lewis, Plaintiff was booked into the jail on April 17, 2019. (*Id.* at 6, 19). And he was released on bond the same day while in the hospital. (*Id.*). Maj. Lewis states that Plaintiff was not re-booked into the jail until May 1, 2019, which is where he remained until August 12, 2019. (*Id.* at 6, 16). On June 25, 2019, Plaintiff submitted a request,

not a grievance, related to the April 17, 2019, incident. More specifically, Plaintiff requested preservation of video and other documentation from April 17, 2019. (*Id.*). Plaintiff never submitted a grievance about the use of force against him on April 17, 2019. (*Id.*).

Plaintiff admits that he did not file a grievance regarding the April 17, 2019, incident. But he argues that the inmate grievance procedure was unavailable to him under the circumstances. (Doc. 182 at 2-6). Plaintiff points out that he was not a jail "inmate" from April 17, 2019, to May 1, 2019. So, he argues that by its terms the jail's grievance policy did not apply to him during that time. Plaintiff states that he was re-booked into the jail at 11:37 p.m. on May 1, 2019. At that time, he could not access the kiosk system to file a grievance because the system closed at 11:00 p.m. (*Id.* at 5-6).

Plaintiff's argument that the grievance procedure was unavailable to him is well taken given the unique circumstances of this case. It is undisputed that the jail's grievance policy applies to "inmates." And the policy defines "inmates" as persons being held in the jail. (Doc. 163-6 at 60, 68). In this case, Plaintiff was not held in the jail from April 17, 2019

15

to May 1, 2019 at 11:37 p.m.  (Doc. 163-6 at 6, 14, 16; Doc. 182 at 4-6).

Rather, during that time he was in the hospital and had been released

from jail custody on a cash bond.  (Doc. 159-1, 81:19-24; Doc. 163-6 at 6,

19-21).  While in the hospital as a non-inmate, Plaintiff did not have

access to the jail grievance kiosk nor did he have access to a pod deputy

from whom he could obtain a paper grievance form.  *See generally Rucker*

*v. Giffen*, 997 F.3d 88, 93-94 (2d Cir. 2021) (finding that inmate's "medical

condition and his extended hospitalization outside of the prison

presented such obstacles to filing a grievance that the grievance

procedures were 'incapable of use'").

Plaintiff was re-booked into the jail at 11:37 p.m. on May 1, 2019.

(Doc. 163-6 at 6, 16).  Assuming *arguendo* that the grievance clock

continued to run while Plaintiff was not an inmate, he had had twenty-

three minutes left of his fourteen-day deadline to file a grievance

regarding the April 17, 2019, incident.  But Plaintiff says, and

Defendants have not disputed, that the kiosk had closed for the night.

(Doc. 182 at 6).  And Plaintiff was not taken to his housing unit until after

16

midnight, so he did not have access to a pod deputy from whom to obtain a hard copy grievance form.  (*Id.*).

Under the circumstances, the Court concludes that Plaintiff has sufficiently shown that the inmate grievance procedure was unavailable to him.  He was not an "inmate" for most of the fourteen-day grievance period, and then once he was again an "inmate," he lacked access to the equipment to timely submit a grievance.  Thus, Defendants' argument that Plaintiff failed to exhaust his administrative remedies lacks merit.

### B.    Defendants Hays, Campbell, Pendleton, and Nowlin are not entitled to summary judgment based on qualified immunity.

Plaintiff asserts claims of excessive force and failure to intervene against Defendants Hays, Campbell, Pendleton, and Nowlin.  (Doc. 144). Defendants claim summary judgment is warranted because of qualified immunity.  For the reasons below, the Court disagrees.

"Under the qualified immunity doctrine, government officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for suit violates clearly established federal statutory or constitutional rights of which a

17

reasonable person would have known." *Sanders v. Howze*, 177 F.3d 1245, 1249 (11th Cir. 1999). To receive qualified immunity, government officials "must first demonstrate that they were engaged in a discretionary duty." *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005). If they were, then the burden shifts to the plaintiff to establish that qualified immunity is unwarranted. *Id*. When considering the issue of qualified immunity at the summary judgment stage, a court must "resolve all issues of material fact in favor of the plaintiff." *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). A court then answers "the legal question of whether the defendant is entitled to qualified immunity under that version of facts." *Id*. (cleaned up). That legal question has two parts. First, the plaintiff's allegations, if true, must establish a violation of a constitutional right. *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). Second, that constitutional right must have been clearly established when the incident occurred. *Id*. The plaintiff must satisfy both parts, but the "analysis may be done in whatever order is deemed most appropriate for the case." *Id*.

### 1.    Constitutional violation analysis

It is undisputed that Defendants were performing a discretionary duty.  Thus, the Court will first discuss whether the alleged conduct of Defendants Hays, Campbell, Pendleton, and Nowlin violated one of Plaintiff's constitutional rights.  Because Plaintiff was a recent arrestee when the incident occurred, his excessive force and failure to intervene claims will be analyzed under the Fourth Amendment.  *See Saunders v. Duke*, 766 F.3d 1262, 1266-67 (11th Cir. 2014) (applying the Fourth Amendment to an excessive force claim involving a recent arrestee); *see also Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) (recognizing that an officer can violate the Fourth Amendment by failing to intervene when another officer uses excessive force).

The Fourth Amendment protects individuals from unreasonable searches and seizures.  That protection "encompasses the plain right to be free from the use of excessive force." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) (cleaned up).  To prevail on a Fourth Amendment excessive force claim, a plaintiff must show "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v.*

*Hendrickson*, 576 U.S. 389, 397 (2015). In determining the reasonableness of an officer's use of force, "a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1321 (11th Cir. 2017). If the force used was objectively unreasonable, then there has been a Fourth Amendment violation. *Myrick v. Fulton Cnty.*, 69 F.4th 1277, 1301 (11th Cir. 2023).

When conducting the objective reasonableness inquiry, a court considers the following factors: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to flee. *Graham v. Connor*, 490 U.S. 386, 396 (1989). An officer can also violate the Fourth Amendment by not intervening when another officer has used excessive force. *Byrd*, 783 F.2d at 1007. This liability arises when the officer was in a position to intervene but failed to do so. *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000).

Before discussing the individual *Graham* factors, the Court will address a big picture argument that permeates Defendants' briefing. Defendants highlight that Plaintiff has admitted to memory lapses regarding certain details of the incident, and Defendants point to some inconsistent statements Plaintiff has made about what happened. The thrust of Defendants' argument is that Plaintiff is not credible and, therefore, his version of events should be disregarded in favor of Defendants' version of events. The Eleventh Circuit has held that before the Court may disregard the non-moving party's version of events, the evidence "must so utterly discredit the party's story that no reasonable jury could have believed that party." *Brooks v. Miller*, 78 F.4th 1267, 1278 (11th Cir. 2023). But if the evidence "renders a party's story merely unlikely" then the "default rule kicks in: [the Court] must accept the party's version for purposes of considering the motion for summary judgment." *Id.*

The default rule applies here. It is true that Plaintiff has admitted to memory lapses regarding aspects of the incident. It is also true that Plaintiff admitted to using Defendants' incident reports to identify which

21

Defendants participated in each use of force. Plaintiff explained, however, that he could not see the officers during the incident because they were behind his back a lot of the time. He also stated that he was experiencing a medical issue that rendered him nearly unconscious at times. But Plaintiff recalled being "thrown" to the ground while handcuffed behind his back, placed in a "chokehold," having his eyes pried open while pepper spray was applied to his face, being tasered repeatedly, being physically struck, and being tasered after he was in the restraint chair. (Doc. 159-1, 156:4-8, 157:7-12, 161:6-20, 216:6-16, 220:13-22, 221:13-20, 222:22–223:25; 225:14–226:8, 232:16-25). Plaintiff's memory of being tasered repeatedly is corroborated by the taser logs, which appear to show that one taser (assigned to Defendant Hays) was used *seven* times during the incident and another (assigned to Defendant Campbell) was used twice.[4] (Doc. 170-1 at 21).

---

[4] Although the log for the taser assigned to Defendant Hays appears to show seven activations during the incident (Doc. 170-1 at 21), Defendant Hays claims to have only used his taser twice on Plaintiff. (Doc. 163-4 at 6-7). Defendants have provided no explanation for the discrepancy between the taser log and Defendant Hays' version of events.

As Defendants acknowledge, there is no video footage of what occurred in the Change Out Room. And Plaintiff and Defendants tell different stories about who did what when and how in that room. Although Plaintiff's memory may be spotty regarding certain details of the incident, that is not a sufficient basis for granting summary judgment in Defendants' favor under the circumstances of this case. Rather, the accuracy of Plaintiff's memory is a credibility issue to be argued to the jury.

The Eleventh Circuit reached the same conclusion in an analogous case—*Cortes v. Broward Cnty., Fla.*, 758 F. App'x 759 (11th Cir. 2018). In *Cortes*, the plaintiff alleged that jail intake officers used excessive force against him. According to the plaintiff's sworn complaint, the defendants repeatedly struck the plaintiff, stripped him of his clothing, and then sprayed him in the genitals and face with pepper spray. *Cortes*, 758 F. App'x at 762. The plaintiff claimed the defendants used that force against him even though he was not resisting. *Id*. During discovery, the plaintiff submitted an affidavit that contradicted some information that he had provided in his initial complaint. *Id*. The plaintiff explained that

23

through discovery his recollection had been refreshed regarding some parts of the incident that he had not previously remembered.  *Id.*

In support of their motion for summary judgment, the *Cortes* defendants argued that the court should disregard the plaintiff's version of events due to his inconsistent memory.  *Id*. at 763-64.  Rejecting that argument, the Eleventh Circuit affirmed the district court's denial of summary judgment.  According to the *Cortes* court, "[v]ariations in [the plaintiff's] testimony and his failure of memory create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all, which is an issue for the jury to resolve."  *Id*. at 764.

What was true in *Cortes* is true here.  Plaintiff's memory lapses regarding certain aspects of the incident are matters to be explored at trial and do not provide the basis for granting judgment as a matter of law for Defendants.  That is so because "[i]ssues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact."  *Tippens v. Celotex Corp.*,

805 F.2d 949, 954 (11th Cir. 1986).[5] Consistent with precedent, the Court will now proceed to analyze the *Graham* factors set forth above.

### a.    Severity of the crime at issue

The first *Graham* factor is the severity of the crime. In this case, Plaintiff was arrested for driving with a suspended license. That is a non-violent and minor offense. And as the Eleventh Circuit has recognized, "[g]enerally, more force is appropriate for a more serious offense and less force is appropriate for a less serious one." *Vinyard*, 311 F.3d at 1347 (cleaned up). This factor, therefore, weighs in Plaintiff's favor.[6]

---

[5] The Eleventh Circuit has repeatedly held that summary judgment is improper when the parties' versions of events contradict each other and whose version is correct requires a credibility judgment. *See, e.g.*, *Logan v. Smith*, 439 F. App'x 798, 801 (11th Cir. 2011) (reversing summary judgment where the evidence did not flatly contradict the plaintiff's allegations and, therefore, his version of the event could not be discounted—nor the defendants' version credited—at the summary judgment stage); *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (finding that prisoner's sworn statements were sufficient to defeat summary judgment where defendant's evidence did not entirely discredit plaintiff's story); *Joassin v. Murphy*, 661 F. App'x 558, 559-60 (11th Cir. 2016) (finding that the self-serving testimony of the defendants was insufficient to utterly discredit plaintiff's sworn account of events).

[6] There is no dispute that Plaintiff was arrested for driving with a suspended license. Defendants argue that when considering this

**b.    Immediate threat to safety of the officers or others**

The second *Graham* factor requires the Court to consider if "under [Plaintiff's] account," *Vinyard*, 311 F.3d at 1347, he posed an immediate threat to the safety of officers or others. When making this determination, the Court focuses on the moment when Defendants used the alleged excessive force without regard to whether Plaintiff "posed some threat to the officers early in the encounter." *Acosta v. Miami-Dade Cnty.*, No. 22-11675, 2024 WL 1326641, at *4 (11th Cir. Mar. 28, 2024). It appears undisputed at this point that the uses of force occurred in the

---

*Graham* factor, the Court should also consider that Plaintiff was suspected of possessing contraband in a jail at the time force was used against him. Although that is a more serious crime than the traffic offense, it is not the crime for which Plaintiff was arrested. And the cases seem to indicate that the first *Graham* factor focuses on the crime for which the suspect was arrested. *See Fils*, 647 F.3d at 1288 (explaining that "the crime for which [the plaintiff] was arrested was not serious"); *see also Brown v. City of Huntsville*, 608 F.3d 724, 739 (11th Cir. 2010) (analyzing the *Graham* factors and stating that the plaintiff "was not arrested for a serious crime"). In any event, the ultimate resolution of this case does not hinge on the severity of the offense factor. If the focal point for the first *Graham* factor is the possession of contraband in a jail as opposed to the traffic offense, that may perhaps make the first factor neutral or it may slightly favor Defendants. But when balanced with the other factors under the record in this case, it does not change the result.

26

Change Out Room.  Thus, the question before the Court is whether—accepting Plaintiff's version of events—Plaintiff posed an immediate threat when the force was used against him.  The answer is no.

According to Plaintiff's sworn complaint and deposition testimony, he was not physically resisting Defendants in the Change Out Room. Plaintiff claims he was unresponsive or nearly unconscious during parts of the incident and secured in handcuffs or a restraint chair during others.  Accepting Plaintiff's version of events, he was repeatedly pepper-sprayed (including directly in the eye while his eyelids were pried open), he was tasered multiple times (at least nine times according to the taser logs), he was hit twice in the face, and he was placed in a neck hold despite not physically resisting and being in the midst of a medical emergency.  Although Plaintiff was refusing to spit out an item in his mouth, that item did not pose an immediate threat to the officers.  Nor did Plaintiff's possession of that item—at the moment the force was used—pose an immediate threat to others.  Plaintiff was secured in a holding area outside the general population of the jail, and he was not going to enter the jail's general population with the item in his mouth.

27

The Court would also note that the lack of an immediate threat here is shown by what ultimately occurred—i.e., the deputies eventually called an ambulance, Plaintiff spit out the item to paramedics, and he was transported to the hospital for treatment. Nothing in terms of the threat Plaintiff posed to the officers or others had substantially changed from the time Plaintiff entered the jail until the time the ambulance arrived. He had the baggie in his mouth when he entered the jail, and he had the baggie in his mouth when he was placed on the paramedics' gurney. What had changed, however, was that in the time between his arrival at the jail and the time he left in the ambulance, Plaintiff (again, accepting his version of events) had been pepper sprayed repeatedly (including with his eyes pried open), tasered repeatedly, struck in the face, and placed in a neck hold, all while he was not resisting and instead was experiencing a medical emergency. The second *Graham* factor, therefore, weighs in Plaintiff's favor.

### c.    Actively resisting or attempting to evade arrest by flight

Under the third *Graham* factor, the Court is required to consider if, "under [Plaintiff's] account," *Vinyard*, 311 F.3d at 1347, he was actively

28

resisting or attempting to evade arrest by flight. Plaintiff was not attempting to flee in this case. Nor—according to his version of events—was he actively resisting the officers. Although Plaintiff admits that he failed to comply with Defendants' directives to spit out what was in his mouth, Plaintiff denies physically resisting the officers. He claims he was restrained either in handcuffs or a restraint chair when some of the force was used against him.

In their motions and supporting documents, Defendants repeatedly state that Plaintiff was physically resisting them. They say he was spitting, grabbing their arms, and attempting to break free. But Defendants have no video footage showing this resistance. There are no eyewitness reports from uninterested parties regarding Plaintiff's resistance. Instead, there are sworn statements by Defendants saying Plaintiff was resisting. And there are sworn statements by Plaintiff saying he was not resisting. Clearly somebody is telling the truth and somebody is not. But it is the jury's job to decide which party is Pinocchio. For purposes of deciding qualified immunity at the summary judgment stage, the Court must "view the facts in the plaintiff's favor." *Post v. City*

*of Ft. Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993). When that is done here, the third *Graham* factor weighs in favor of Plaintiff.

The weight of the three *Graham* factors favor Plaintiff. In addition to considering the *Graham* factors, when assessing the reasonableness of force used the Eleventh Circuit has examined "the need for the application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted." *Acosta*, 2024 WL 1326641, at *4 (cleaned up). Here, there may have been a need for some physical force to be applied given Plaintiff's refusal to follow commands to spit out what was in his mouth. But, construing the evidence in the light most favorable to Plaintiff, there is a significant mismatch between the need for force and the amount of force used here. Although it may be reasonable to use some force in an attempt to gain compliance with a command to spit out an item, it is unreasonable for officers to pepper spray a suspect repeatedly (including into eyes that are pried open), taser him time and again, strike him in the face multiple times, and use a neck hold against him—especially when the suspect is restrained and neither physically resisting nor attempting to flee. As for the extent of the injury

inflicted, Plaintiff claims that he suffered a bloody nose and mouth, burn marks from the taser probes, and pain.  These are certainly not the most severe injuries.  But many of the uses of force alleged by Plaintiff are not the type that leave permanent injuries—i.e., pepper spraying and tasering.  That does not mean, however, that their use cannot be excessive force.  *See, e.g.*, *Vinyard*, 311 F.3d at 1348 (recognizing that the use of pepper spray on a secured arrestee who poses no threat to officers can be excessive force); *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (holding that use of taser on subdued suspect arrested for minor crime could be excessive force).

For the reasons above, Plaintiff has sufficiently shown for summary judgment purposes that Defendants Hays, Campbell, Pendleton, and Nowlin violated his Fourth Amendment rights.[7]  The

---

[7] Plaintiff has alleged that Defendants Hays, Campbell, Pendleton, and Nowell also failed to intervene when excessive force was used.  All four of these Defendants were present in the Change Out Room and clearly had the ability to intervene during the incident.  "[W]here the use of force is declared clearly unconstitutional, the officers that failed to intervene are no more entitled to qualified immunity than the officer using force."  *Helm v. Rainbow City, Ala.*, 989 F.3d 1265, 1278 (11th Cir. 2021) (cleaned up).

Court, therefore, turns to the question of whether that right was clearly established at the time of the incident.

### 2.    Clearly established analysis

For qualified immunity purposes, "clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would have understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up). Put another way, "the salient question is whether the state of the law gave the officers fair warning that their alleged treatment of the plaintiff was unconstitutional." *Vinyard*, 311 F.3d at 1350.

In the Eleventh Circuit, a right can be clearly established in one of three ways. First, "a materially similar case has already been decided." *Mercado*, 407 F.3d at 1159. Second, there is a "broader, clearly established principle" that should control the novel facts in this situation." *Id*. Third, the "case fits within the exception of conduct which so obviously violates th[e] constitution that prior case law is unnecessary." *Id*.

At the time of the incident in this case, there was no binding precedent involving materially similar circumstances. But there was a "broader, clearly established principle" that "should control the novel facts in this situation." *Id*. at 1159. For purposes of that test, "if some authoritative judicial decision decides a case by determining that 'X conduct' is unconstitutional without tying that determination to a particularized set of facts, the decision on 'X conduct' can be read as having clearly established a constitutional principle." *Randall v. Scott*, 610 F.3d 701, 715 (11th Cir. 2010) (cleaned up).

On the date Defendants engaged in the alleged conduct, the Eleventh Circuit had previously recognized broad and clearly established principles that were sufficient to place Defendants on notice that their alleged conduct was unconstitutional. The allegations in this case involve the repeated tasering of an arrestee[8] who was charged with a minor crime and was neither actively resisting nor attempting to flee.

---

[8] As previously mentioned, the log for two tasers appears to show that they were used nine times during the incident involving Plaintiff. (Doc. 170-1 at 21-22). And Plaintiff has said he believes he was tasered at least ten times. (Doc. 159-1 at 81).

33

And, accepting Plaintiff's view of the facts, some of the taser uses occurred when Plaintiff was secured in handcuffs and/or a restraint chair.

As of 2018, the Eleventh Circuit had "conclude[d] that it was clearly established…that the repeated tasing of a suspect who had ceased any resistance was unlawful." *Glasscox v. Argo*, 903 F.3d 1207, 1218 (11th Cir. 2018); *see also Helm*, 989 F.3d at 1276 (recognizing that it was clearly established that "the repeated tasing of a subdued arrestee who had ceased any resistance or threatening conduct is excessive in violation of the Fourth Amendment"). Thus, in April of 2019 when the current incident took place, "a reasonable officer…would have had fair warning that repeatedly deploying a Taser…after [the suspect] was handcuffed and had ceased resisting, was constitutionally excessive." *Wate v. Kubler*, 839 F.3d 1012, 1021 (11th Cir. 2016). Indeed, the Eleventh Circuit recently recognized that in 2014 it was clearly established that "a police officer is prohibited from using force" of any kind "against a *non*-resisting suspect." *Acosta*, 2024 WL 1326641, at *5 (emphasis in original). And in *Acosta*, the court explained that even if a single use of the taser was

34

appropriate to gain control of a suspect that fact "doesn't justify additional tases or kicks once he was [on the ground] and stopped resisting." *Id*.[9]

Plaintiff also claims that Defendants repeatedly pepper sprayed him, including holding his eyes open and spraying directly into them. In addition to the pepper spraying and tasering, Plaintiff alleges he was struck in the face, and also placed in a hold around his neck. Those uses of force allegedly occurred when Plaintiff was restrained (at least for a portion of the uses of the force), was not attempting to flee, and was not resisting.

The Eleventh Circuit recognized that beginning in 2005 "the law was clearly established…that [an officer's] combined gratuitous use of pepper spray and other force" against an arrestee "suspected only of a minor offense" who was not resisting or attempting to flee "violated the Constitution." *Brown*, 608 F.3d at 739-40; *see also Vinyard*, 311 F.3d at

---

[9] In reaching its decision, the *Acosta* court reaffirmed that when making the determination for summary judgment purposes of whether a suspect was resisting, a court must "indulge[] the plaintiff's version of the facts." *Id*. at *6.

1355 (finding in 2002 that officers violated a clearly established right by pepper spraying and grabbing by the hair and arm an intoxicated arrestee who was restrained and no longer posing a risk to officers).

The broad principles announced in the cases cited above were sufficient to notify Defendants that their conduct was unconstitutional. Support for that conclusion is found in the highly analogous case of *King v. Reap*, 269 F. App'x 857 (11th Cir. 2008). In *King*, the plaintiff brought excessive force and failure to intervene claims against officers who arrested him for a traffic violation. *Id*. at 858. During the encounter, the officers noticed the plaintiff had a baggie in his mouth. *Id*. He refused to spit out the baggie. *Id*. The officers handcuffed the plaintiff, and he continued to refuse demands to spit out the baggie. *Id*. The officers then slammed the plaintiff to the ground, struck him with a flashlight, pepper sprayed him, and attempted to use an object to pry open his mouth. *Id*.

The district court denied the officers' motion for summary judgment based on qualified immunity because "taking the facts in the light most favorable to [the plaintiff], the [officers] used excessive force or failed to intervene when excessive force was being used." *Id*. Affirming that

36

decision, the Eleventh Circuit rejected the officers' argument that the force used was reasonable because the plaintiff was concealing a baggie in his mouth. *Id*. at 859. According to the *King* court, "the amount of force used was not reasonable" because "according to [the plaintiff], he was not attempting to escape or violent." *Id*. Additionally, the incident did not involve "a split-second decision" but instead occurred over the span of "at least five minutes." *Id*. As for the clearly established requirement, the Eleventh Circuit said "[t]here is no question" the officers "had fair warning that their actions violated [the plaintiff's] rights." *Id*. at 860.

The facts of this case are similar to those in *King*. Just as the officers there had fair warning that they could not pepper spray, slam, and strike a non-resisting arrestee who refused to spit out a baggie from his mouth, Defendants here had fair warning that they could not repeatedly taser, repeatedly pepper spray, and strike Plaintiff when (according to his version of facts) he was neither resisting nor attempting to flee. Accordingly, Defendants Hays, Campbell, Pendleton, and Nowell

are not entitled to summary judgment based on qualified immunity. Their motions for summary judgment thus should be denied.[10]

**C. Defendants Schultz and Rowell are not entitled to summary judgment on Plaintiff's failure to intervene claims based on qualified immunity.**

Plaintiff also has a pending claim against Defendants Schultz and Rowell for failing to intervene when the other Defendants used excessive force against him. Defendants Schultz and Rowell seek summary judgment on that claim based on qualified immunity.

The Eleventh Circuit has explained that "in cases where the use of force is declared clearly unconstitutional, the officers that failed to intervene are no more entitled to qualified immunity than the officer using the force." *Helm*, 989 F.3d at 1278. Additionally, a police officer's "duty to intervene when he witnessed the use of excessive force and had

---

[10] With respect to the failure to intervene claims against these Defendants, the Court need not conduct a separate clearly established analysis. That is so because "[o]nce this Court establishes that the use of force is not entitled to qualified immunity and other officers could have intervened but did not, the Court does not conduct a separate clearly established analysis pertaining to each officer's failure to intervene." *Helm*, 989 F.3d at 1278.

the ability to intervene" has been clearly established since at least 1994. *Priester,* 208 F.3d at 927.

Because the Court has determined that, when the facts are viewed in Plaintiff's favor, Defendants Hays, Campbell, Pendleton, and Nowell violated Plaintiff's constitutional rights by using excessive force and the duty to intervene was clearly established, Defendants Schultz and Rowell "are no more entitled to qualified immunity than the officer[s] using the force." *Id*. Accordingly, Defendants Schultz and Rowell are not entitled to summary judgment based on qualified immunity.

### D. Defendants Schultz and Rowell are not entitled to summary judgment because there are genuine issues of material fact regarding their failure to intervene.

In addition to seeking summary judgment based on qualified immunity, Defendants Schultz and Rowell argue they are entitled to summary judgment because there are no genuine issues of material fact regarding their ability to intervene when the other Defendants allegedly used excessive force. (Doc. 164 at 34-36). More specifically, Defendant Rowell argues that he was a patrol deputy who lacked any authority over the other Defendants—who were detention deputies assigned to the jail.

He further argues that he was not inside the Change Out Room when the other Defendants allegedly used force against Plaintiff and, therefore, he lacked the ability to intervene. Defendant Schultz similarly argues that he did not observe any excessive force and, therefore, cannot be held liable for failing to intervene. (Doc. 166 at 35-36). For the reasons below, the Court is not persuaded by these arguments.

An officer, regardless of supervisory status, can violate the Fourth Amendment by not intervening when another officer has used excessive force. *Byrd*, 783 F.2d at 1007. This liability arises when the officer was in a position to intervene but failed to do so. *Priester*, 208 F.3d at 927. An officer is not in a position to intervene if he did not witness the use of force or was not present when it occurred. *Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1281 (11th Cir. 2023).

### 1.    Defendant Rowell

When the evidence is viewed in light most favorable to Plaintiff, there are genuinely disputed issues of material fact regarding whether Defendant Rowell was in a position to intervene. The video does not show what occurred in the Change Out Room, but it does show that Defendant

Rowell was in and out of the Change Out Room during the approximately thirteen minute period involved in this case. When not in the Change Out Room, Defendant Rowell regularly looked into the Change Out Room.

Because this incident lasted approximately thirteen minutes, it cannot be said that this was such a quickly evolving situation that Defendant Rowell lacked the time to intervene before force was used. *Cf. Johnson v. White*, 725 F. App'x 868, 878 (11th Cir. 2018) ("Instances of force that occur within seconds do not place officers in a realistic position to intervene."). Moreover, there were multiple uses of force by multiple people and some of those uses of force were allegedly done after orders were given by others. If there was sufficient time for a Defendant to order a particular use of force and another Defendant to comply with that order, then there was sufficient time for Defendant Rowell to intervene. And Defendant Rowell has admitted that he saw other Defendants using force against Plaintiff in the Change Out Room. More specifically, Defendant Rowell has stated that he saw Defendant Pendleton strike

Plaintiff twice, he saw Plaintiff pepper sprayed at least once, and he saw Plaintiff tasered. (Doc. 163-1 at 7, 9).

Despite Defendant Rowell's argument to the contrary, the evidence in the record is sufficient for a reasonable juror to conclude that Defendant Rowell saw what was occurring in the Change Out Room and had the ability to intervene. Yet he decided not to. Whether that decision should result in Defendant Rowell's liability for failure to intervene is a question for the jury to answer.

Although Defendant Rowell has relied on *Baker v. City of Madison*, 67 F.4th 1268 (11th Cir. 2023) in his motion (*see* Doc. 164 at 34), that case bears little resemblance to the current one. In *Baker*, the Eleventh Circuit rejected the plaintiff's failure to intervene claim because the officer "did not witness [the other officer's] use of the taser and thus did not have the ability to intervene to prevent that use of force." *Id.* at 1281. Here, on the other hand, Defendant Rowell *did* witness other officers strike, pepper spray, and taser Plaintiff. *Baker*, therefore, does not help Defendant Rowell. Instead, this case is like *King* where the Eleventh Circuit held that summary judgment was not warranted on a failure to

42

intervene claim against officers who "witnessed" the use of force by others (against a suspect who refused to spit out a baggie of drugs) and did nothing to stop it. *King*, 269 F. App'x at 860. Accordingly, Defendant Rowell's motion for summary judgment should be denied.

### 2. Defendant Schultz

Unlike Defendant Rowell, Defendant Schultz was in the Change Out Room when much of the force was used against Plaintiff. (Doc. 163-3 at 2-4). Indeed, Defendant Schultz admits that he was present in the Change Out Room when other Defendants used pepper spray and "utilized Tasers" on Plaintiff. (*Id.* at 3). Defendant Schultz further admits obtaining the restraint chair and bringing it into the Change Out Room. (*Id.*). But Defendant Schultz claims he is entitled to summary judgment because he "did not observe any excessive force that might have given rise to a duty to intervene to stop it." (Doc. 166 at 36). The Court disagrees.

Defendant Schultz was in the Change Out Room and witnessed force being used by other Defendants on Plaintiff over a relatively extended period of time. He clearly had the ability to intervene. He

decided not to. Defendant Schultz says he did not need to intervene because the force being used by the other Defendants was not excessive. As set forth above, however, when the events are construed in the light most favorable to Plaintiff, a reasonable juror could find the force used was excessive. And a reasonable juror could conclude, therefore, that Defendant Schultz failed to intervene to prevent such excessive force from being used. So, Defendant Schultz is not entitled to summary judgment on Plaintiff's failure to intervene claim.

### E.   Plaintiff is not entitled to summary judgment because there are genuinely disputed issues of material fact.

Having explained why Defendants' motions for summary judgment should be denied, it is now necessary to explain why Plaintiff's motion for summary judgment should be denied. In his motion, Plaintiff argues that "there is no genuine issue regarding any material fact" and, therefore, he "is entitled to judgment as a matter of law." (Doc. 170 at 1). The Court disagrees. There are actually multiple genuinely disputed issues of material fact that render summary judgment inappropriate. Here are some of them:

- *Was Plaintiff physically resisting Defendants when they used force against him?*
  - Plaintiff says he was not physically resisting. (Doc. 159-1 at 226).
  - Defendants say he was physically resisting. (Doc. 170-1 at 92, 103, 105).
- *What amount of force was used to take Plaintiff to the ground in the Change Out Room?*
  - Plaintiff says Defendants "threw" him to the ground while he was handcuffed. (Doc. 159-1 at 63-65, 157; Doc. 30[11] at 8).
  - Defendant Hays says Plaintiff was "taken to the ground in a slow and controlled fashion." (Doc. 170-1 at 61).
- *Were Plaintiff's eyes held open while pepper spray was shot into them on two occasions?*
  - Plaintiff says yes. (Doc. 30 at 8; Doc. 159-1 at 57, 70, 74).
  - Defendants say no. (Doc. 170-1 at 52, 62, 74).
- *How many times was a taser used on Plaintiff by Defendants?*
  - Plaintiff says he was tasered at least ten times by Defendants. (Doc. 159-1 at 81).
  - Defendant Hays says he used a taser on Plaintiff twice. (Doc. 170-1 at 11, 61).
  - Defendant Nowlin says Plaintiff was tasered once by Defendant Hays and once by Defendant Pendleton. (Doc. 170-1 at 94).
  - Defendant Campbell says Plaintiff was tasered once by him and once by Defendant Pendleton. (Doc. 170-1 at 54).
  - The taser log appears to show that Defendant Hays' taser (X13006YAE) was used seven times. (Doc. 170-1 at 21). And

---

[11] The Court is required to treat a *pro se* plaintiff's sworn complaint as evidence for purposes of summary judgment. *See Walker v. Poveda*, 735 F. App'x 690 (11th Cir. 2018) (per curiam) (finding that the district court erred by failing to consider *pro se* plaintiff's sworn complaint as evidence at the summary judgment stage).

the taser log appears to show that Defendant Campbell's taser (X13006YAD) was used two times. (Doc. 170-1 at 22).

- *Was Plaintiff tasered while secured in restraints?*
  - o Defendants do not recall whether Plaintiff was handcuffed while tasered. (Doc. 170-1 at 51, 53, 74, 94).
  - o Plaintiff says he was handcuffed while tasered. (Doc. 159-1 at 77).
  - o Plaintiff says he was tasered while restrained in a restraint chair. (Doc. 30 at 12; Doc. 159-1 at 77-79, 226-27).
  - o Defendants say they only placed a spit hood/shield on Plaintiff's head once he was secured in a restraint chair. (Doc. 163-2 at 4-5; 163-4 at 6; Doc. 163-5 at 6).
- *Was Plaintiff hit in the face causing him a bloody nose and mouth?*
  - o Defendant Pendleton says he struck Plaintiff twice in the shoulder area and the back when he was unrestrained. (Doc. 170-1 at 103-04).
  - o Defendant Nowlin says he used a "palm strike" on Plaintiff, but "did not hit" him. (Doc. 170-1 at 96). Defendant Nowlin states that Defendant Pendleton used "reactionary strikes" against Plaintiff. (*Id.* at 97).
  - o Plaintiff says he was repeatedly hit in the face, which caused him to bleed from his nose and mouth. (Doc. 159-1 at 66; Doc. 30 at 14).

As reflected by the examples cited above, there are multiple material facts in this case that are genuinely disputed. The Court, therefore, cannot grant summary judgment in favor of either side. If things happened as Plaintiff says they did, then a reasonable jury could find that the amount of force used by Defendants Hays, Pendleton, Campbell, and Nowlin was objectively unreasonable in violation of the

Fourth Amendment. A reasonable jury also could find that each of those Defendants, as well as Defendants Schultz and Rowell, had a reasonable opportunity to intervene in the other Defendants' uses of force but failed to do so. On the flip side, if things happened as Defendants say they did, then a reasonable jury could find that the amount of force that each officer used was objectively reasonable and did not violate the Fourth Amendment. And if the force used was objectively reasonable, then none of the Defendants had a duty to intervene. The bottom line is that exactly what happened here needs to be decided by a jury. *See generally Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (recognizing that "[i]t is not the court's role to weigh conflicting evidence or to make credibility determinations" at the summary judgment stage).

## V.    Conclusion

For the reasons above, it is respectfully **RECOMMENDED** that:

1.    Defendants' motions for summary judgment (Docs. 164, 165, 166) be **DENIED**.

2.    Plaintiff's motion for summary judgment (Doc. 170) be **DENIED**.

At Pensacola, Florida this 24th day of April 2024.

/s/ *Zachary C. Bolitho*
Zachary C. Bolitho
United States Magistrate Judge

## **Notice to the Parties**

Objections must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.